UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                                 :

UNITED STATES OF AMERICA,        :

                                 :     Case No. 21 CR 760 (CM)

      - against -          :

                                 :

PUNEET DIKSHIT,            :

                                 :

                  *Defendant*.      :

                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

 

**SENTENCING MEMORANDUM OF PUNEET DIKSHIT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

I.      PRELIMINARY STATEMENT ............................................................................ 1

II.     SENTENCING GUIDELINES................................................................................ 4

III.    MR. DIKSHIT'S PERSONAL BACKGROUND AND CHARACTER .......................... 5

        A.      Background ............................................................................................... 5

        B.      Mr. Dikshit's Steadfast Commitment to Family................................... 7

        C.      Kind Acts and Good Deeds Punctuate Mr. Dilshit's Life .................... 12

        D.      Mr. Dikshit Has Remained Committed to Charitable Work and
                Community Service Throughout his Life ............................................. 16

IV.     THE 18 U.S.C. § 3553(a) FACTORS WEIGH IN FAVOR OF A NON-
        INCARCERATORY SENTENCE .......................................................................... 21

        A.      Mr. Dikshit's Life and Character Support a Below-Guidelines Sentence ........... 21

        B.      Mr. Dikshit Does Not Pose a Risk of Recidivism ................................. 24

        C.      Enhancements Related to Gain Amount Overstate the Seriousness of the
                Offense................................................................................................... 27

        D.      The Collateral Consequences Mr. Dikshit Faces As a Non-Citizen Weigh
                in Favor of a Non-Incarceratory Sentence .......................................... 28

                1.      Disparate Treatment................................................................. 29

                2.      Deportation ............................................................................... 31

V.      CONCLUSION.................................................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Gall v. United States*,
   552 U.S. 38 (2007)...................................................................................................5

*Padilla v. Kentucky,*
   559 U.S. 356 (2010)...............................................................................................32

*United States v. Canova*,
   412 F.3d 331 (2d Cir. 2005), *remanded in part on other grounds*,
   2005 WL 6051354 (D. Conn. Nov. 10, 2005) ........................................ 21-22, 24

*United States v. Chong*,
   No. 13-CR-570, 2014 WL 4773978 (E.D.N.Y. Sept. 24, 2014)..................28, 31, 32

*United States v. Cooper*,
   394 F.3d 172 (3d Cir. 2005)...........................................................................21, 23, 24

*United States v. Gaind*,
   829 F. Supp. 669 (S.D.N.Y. 1993), *aff'd*,
   31 F.3d 73 (2d Cir. 1994).......................................................................................25

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012)...............................................................27, 28

*United States v. Johnson*,
   No. 16-CR-475-1 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018)............................28

*United States v. Mehta*,
   307 F. Supp. 2d 270 (D. Mass. 2004)................................................21, 22, 23, 24

*United States v. Nesbeth*,
   188 F. Supp. 3d 179 (E.D.N.Y. 2016) ...............................................................25, 28

*United States v. Thavaraja*,
   740 F.3d 253 (2d Cir. 2014).................................................................................32

*United States v. Toback*,
   01-CR-410 (RWS), 2005 WL 992004 (S.D.N.Y. Apr. 14, 2005) ....................26, 27

*United States v. Yahaya*,
   No. 18-CR-121, 2019 WL 6839945 (E.D.N.Y. Dec. 9, 2019) ................................31

**Sentencing Transcripts**

*United States v. Connolly*,
   No. 16-CR-370 (S.D.N.Y. Nov. 4, 2019) .............................................................32

*United States v. Holzer*,
   09-cr-470 (VM) (S.D.N.Y. Sept. 17, 2009) ......................................................26

**Statutes & Rules**

8 U.S.C. § 1226(a)(1) ..................................................................................................30

8 U.S.C. § 1226(c)(1) ..................................................................................................30

8 U.S.C. § 1227(a)(2)(A) ............................................................................................30

8 U.S.C. § 1326(a)(2) ..................................................................................................31

18 U.S.C. § 3553(a) ............................................................................................ *passim*

18 U.S.C. § 3624(c)(1) ................................................................................................30

United States Sentencing Guidelines

   U.S.S.G. ch.5, pt. D ...............................................................................................4

   U.S.S.G. § 1B1.1 ...........................................................................................22 n.2

   U.S.S.G. § 2B1.1 .............................................................................................4, 28

   U.S.S.G. § 2B1.4 ...................................................................................................4

   U.S.S.G. § 3B1.3 ...................................................................................................4

   U.S.S.G. § 3E1.1 ...................................................................................................4

   U.S.S.G. § 4A1.1 ...................................................................................................4

**Other Authorities**

*Concerns about ICE Detainee Treatment and Care at Four Detention Facilities*,
   U.S. Dep't of Homeland Security, Office of the Inspector General, Aug. 2016,
   available at https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-
   19-47-Jun19.pdf ...................................................................................................30

*Departure and Variance Primer*, Office of General Counsel, U.S. Sentencing
   Commission, Nov. 2021,
   https://www.ussc.gov/sites/default/files/pdf/training/primers/2021_Primer_De
   parture_Variance.pdf ....................................................................................22 n.2

U.S. Dep't of Justice, Fed. Bureau of Prisons Program Statement, *Change Notice*,
Fed. Bureau of Prisons Program Statement P7310.04 (Dec. 16, 1998),
available at https://www.bop.gov/policy/progstat/7310_004.pdf............................................30

U.S. Dep't of Justice, Fed. Bureau of Prisons Program Statement, *Inmate Security
Designation and Custody Classification*, P5100.08 (Sept. 12, 2006), available
at https://www.bop.gov/policy/progstat/510_008.pdf ......................................................29, 30

Social Responsibility Forum of SBM, NMIMS Mumbai,
https://www.srfnmimsmumbai.com/ (last visited March 14, 2022) ..................................19 n.1

I.     **PRELIMINARY STATEMENT**

      We respectfully submit this memorandum on behalf of Puneet Dikshit, who is scheduled

to be sentenced by this Court on March 30, 2022.  Mr. Dikshit is a non-violent, first-time

offender who pled guilty to one count of securities fraud, and accepted full responsibility for his

offense.

      At his plea hearing, Mr. Dikshit stated:

> Your Honor, I know what I did is wrong, and I knew it was wrong
> when I did it.  While in New York, between July and September
> 2021, I traded GreenSky securities in violation of a duty based on
> confidential and important information.  I accept full responsibility
> for my actions.  I deeply regret the impact my actions have had on
> my colleagues, my clients, my industry, and my family.  I'm
> profoundly sorry.

Plea Tr. at 18:14-21 (Dec. 15, 2021) [ECF No. 11].  Mr. Dikshit entered his plea promptly after

his arrest on November 10, 2021.

      Mr. Dikshit's individual characteristics – in particular, his deep and steadfast

commitment to and support of friends and family, and his extraordinary, hands-on charitable

works throughout his life – and the disparate circumstances he will face in light of his

immigration status and impending deportation militate in favor of a below-Guidelines sentence.

      Mr. Dikshit's offense is an aberration in a life exemplified by hard work, compassion,

generosity, and family.  Mr. Dikshit rose from humble beginnings in India through many years of

education and work in the financial sector to become a partner at McKinsey & Company.  While

reaching those individual accomplishments, Mr. Dikshit consistently demonstrated his

generosity, kindness, and strength of character as a devoted and loving husband, father, son,

brother, and friend.

      Mr. Dikshit is a proud father of two young children, and a devoted husband to his wife,

Bhanushree ("Bhanu").  Mr. Dikshit has supported Bhanu's dreams and career, encouraging her

to challenge herself professionally and to realize her own goals and ambitions.  Despite the demands of his job, Mr. Dikshit consistently made time for his two young children, setting aside play time each night and sharing the parental day-to-day responsibilities of raising them.  His parents make clear that Mr. Dikshit is a devoted son, who returned to India numerous times to support them in times of need, while maintaining a deep connection with them throughout his life.  Similarly, Mr. Dikshit is a caring brother to his sister, whom he visits frequently in Atlanta and has assisted during times of financial and emotional need.  Mr. Dikshit is also a loyal and supportive friend, who has counseled and mentored many friends through professional and personal challenges, devoting substantial time and energy to help them succeed and grow.

Mr. Dikshit's generosity and kindness extend well beyond his immediate circle.  He has devoted substantial time throughout his life to complete strangers.  As a young boy growing up in India, Mr. Dikshit and his father regularly volunteered to feed the homeless.  That experience imparted valuable life lessons about helping those less fortunate, which Mr. Dikshit has applied throughout his life.  For example, during business school in India during 2003, Mr. Dikshit launched a student organization dedicated to raising funds for the underprivileged in India, with a particular focus on the education of underprivileged girls so they could escape poverty.  That organization grew under Mr. Dikshit's leadership into the largest student organization at the university, helping raise funds for countless individuals, and remains vibrant today.  While working for Citibank in India after graduation, Mr. Dikshit spent time each week over many years travelling to the poorest neighborhoods in Mumbai to teach and mentor young students, the majority of whom were underprivileged girls.  Collectively, Mr. Dikshit's charitable work touched the lives of thousands of students, many of whom went on to obtain college educations, in part because of the strong educational foundation Mr. Dikshit helped provide.  Since coming

to the United States, Mr. Dikshit has remained committed to helping the poor by donating money to charities and by imparting the lessons he learned from his father about feeding the homeless to his young daughter.  He is also working with his father to build a school for underprivileged children in his hometown in India.

The Court should also consider the consequences of Mr. Dikshit's conviction in light of his non-citizen status.  Though Mr. Dikshit has lawfully resided in the United States for over a decade, he will be treated differently than an otherwise identical defendant who is a United States citizen.  Mr. Dikshit will serve a longer portion of any period of incarceration in prison because non-citizens are ineligible for early release programs.  Moreover, because Bhanu's residency status is contingent on Mr. Dikshit's visa, she and their two children—who are both United States citizens—will need to move back to India.  As a result, Mr. Dikshit will likely not be able to see his immediate family during a term of incarceration.  Prior to his deportation, Mr. Dikshit will also likely be detained by U.S. Immigration and Customs Enforcement ("ICE"), which would prolong any incarceration.  The consequences Mr. Dikshit faces because of his immigration status should be considered at sentencing, and further support a below-Guidelines sentence.

In light of all the circumstances, applicable sentencing factors, and case law, we respectfully submit that the Court should impose a non-jail sentence, which we submit is sufficient, but not greater than necessary, to achieve the sentencing purposes of section 3553(a). After conducting its investigation and evaluation of Mr. Dikshit and the applicable sentencing factors, the Probation Office similarly recommended a sentence of time served (one day), a two-year term of supervised release.  Presentence Investigation Report ("PSR") (March 8, 2022) [ECF No. 16] at 27–28.

II.   **SENTENCING GUIDELINES**

Under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), sentencing for insider trading cases is calculated under U.S.S.G. § 2B1.4(a). Under that section, Mr. Dikshit's base offense level is eight. Under § 2B1.4(b)(1), courts are directed to the loss table in § 2B1.1 to determine the number of enhancements that apply according to the amount gained as a result of the offense. In this case, 12 levels are added because the gain amount ($455,017) is between $250,000-$500,000. *See* U.S.S.G. § 2B1.1(b)(1)(G)). Two levels are added because the offense conduct involved an abuse of a position of trust. *See* U.S.S.G. §§ 3B1.3 and 2B1.4 cmt. application. Additionally, Mr. Dikshit is entitled to a two-level reduction because he has accepted responsibility for his offense. U.S.S.G. § 3E1.1(a). Further, another one-level reduction is warranted because Mr. Dikshit "has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty." U.S.S.G. § 3E1.1(b). Applying these enhancements and reductions, the total offense level is 19.

Because Mr. Dikshit has no criminal history, he falls into Criminal History Category I. *See* U.S.S.G. § 4A1.1. When combined with an offense level of 19, Mr. Dikshit's Guidelines range is 30 to 37 months. *See* U.S.S.G. ch.5, pt. D. Mr. Dikshit has stipulated to this Guidelines range calculation. PSR ¶ 4(h).

After conducting its investigation and evaluation of Mr. Dikshit and the applicable sentencing factors, the Probation Office recommended a below-Guidelines sentence:

> It is respectfully recommended that the defendant be sentenced to Time Served (one day). A two-year term of supervised release is recommended to allow the probation office to monitor the defendant while in the community and also monitor the payment of any imposed fine. . . . [T]he Government has reported that the victims in the case are not pursuing restitution. Thus, restitution is

not being recommended.  Since restitution is not being
recommended, and based on the defendant's known financial
resources, a $20,000 fine is recommended.

PSR at 27.

### III.   MR. DIKSHIT'S PERSONAL BACKGROUND AND CHARACTER

When sentencing a defendant, courts must consider "the history and characteristics of the

defendant."  18 U.S.C. § 3553(a)(1).  This includes analyzing the background, character, and

conduct of the defendant to "make an individualized assessment based on the facts presented."

*Gall v. United States*, 552 U.S. 38, 50 (2007).

Mr. Dikshit's life and character weigh strongly in favor of a non-Guidelines sentence.

Since he was just 12 years old, Mr. Dikshit has consistently engaged in hands-on charity work,

helping underprivileged members of his Mumbai community.  Throughout his life, he has

performed selfless acts of kindness for family, friends, and strangers alike.  Additionally, Mr.

Dikshit is a dedicated father and husband, who prioritizes family above all else.

Vijayprakash ("Vijay") Dikshit, his father, summarizes Mr. Dikshit's character best:

> Despite his successes, he has always been humble and not just
> willing to help, but also seeking out ways to help. . . .  His devotion
> to his family, service to the community, his hard work, his
> kindness, not just in words but in deeds, his commitment to help
> everyone, are the traits by which I know my son.

Exhibit A, V. Dikshit Ltr. at 2-3.

### A.   Background

Mr. Dikshit was born in 1981 in Mumbai, India, where he grew up with his parents, Vijay

and Sudha Dikshit, and older sister, Nidhi.  Mr. Dikshit spent his entire childhood there,

excelling academically while participating in community activities with his temple.  PSR ¶ 85.

In 1990, Mr. Dikshit began his college education at Sydenham College of Commerce &

Economics, remaining in Mumbai.  PSR ¶ 98.  There, he met his future wife, Bhanu, who was

also studying business.  PSR ¶ 88; Exhibit B, B. Mehra Ltr. at 1.  The two formed a strong

partnership early on, pushing each other to succeed academically as they both endeavored to start

careers in the business world.  In 2003, Mr. Dikshit earned his bachelor's degree and won the

Samsika Award for Excellence in Education, which was given to the best student in the

Sydenham College.  PSR ¶ 98; Exhibit B, B. Mehra Ltr. at 1.

  After graduating college, both Mr. Dikshit and Bhanu pursued post-graduate educations.

The two remained in Mumbai, each attending different business schools.  Mr. Dikshit began a

Master's program at NMIMS, continuing to perform at the top of his class and earning a position

at Citibank by the time be graduated in 2005.  Exhibit B, B. Mehra Ltr. at 1.  Throughout the

next four and a half years, he worked hard to move up through the ranks at Citibank, but began

to realize that he needed a U.S. education if he wanted to move his career beyond courier

banking in India.  Looking toward the future, Mr. Dikshit proposed to Bhanu, who happily

accepted, and started making plans to pursue his career and start a family in the United States.

  In 2011, Mr. Dikshit began an MBA program at University of Michigan's Ross School of

Business, tutoring his peers to help finance his education.  Exhibit B, B. Mehra Ltr. at 1; Exhibit

C, D. Kamath Ltr. at 1.  The next summer, he and Bhanu married.  She also started an MBA

program in the United States, but at New York University.  Though they were hundreds of miles

apart, the two made time to see each most weekends.  Exhibit C, D. Kamath Ltr. at 2.  And when

Mr. Dikshit graduated in 2013, he joined Bhanu in New York and began working as an associate

at McKinsey.  PSR ¶ 102.  At McKinsey, Puneet was consistently given the highest rankings as a

leader and quickly rose through the ranks at McKinsey, even as he grew his family.  Mr. Dikshit

and Bhanu had their daughter in 2018 and Mr. Dikshit became a partner in November 2019.  Just

a year later, Mr. Dikshit and Bhanu had their son.

### B.    Mr. Dikshit's Steadfast Commitment to Family

Mr. Dikshit is a devoted family man.  His, wife, Bhanu, best summarizes Mr. Dikshit's

dedication to his family, explaining, "Puneet's singular focus in all that he has ever done is to

provide for and support his family.  Every responsibility he has shouldered of being a son,

brother, husband, father, and friend has been with unparalleled sincerity, compassion and loyalty.

As an immigrant, he has persevered to achieve and allow his family to live the American dream."

Exhibit B, B. Mehra Ltr. at 2-3.

Mr. Dikshit has been a pillar of support for Bhanu, who he has been with for over twenty

years.  Since meeting each other as students, the two have maintained a strong partnership,

helping each other grow their careers and family.  Bhanu describes the ways Mr. Dikshit enabled

her to break out from the role of homemaker that Indian women traditionally assume:

> Getting married, moving to a new country and starting life as a
> young immigrant couple in New York was all it promised to be for
> us. We made ourselves a small home and I found myself traveling,
> enjoying the city, and living a life I had only dreamed of.  While
> my family believed in making sure I was educated and could
> support myself financially if required, I can fairly say that they
> were never truly ambitious for me professionally.  Puneet had just
> started a new job after his MBA at a leading consulting firm and I
> found myself getting comfortable with the thought of playing the
> role of a homemaker, looking forward to growing my family and
> supporting Puneet as he progressed in his career.  It was the easy,
> comfortable choice to make, one that I had seen women in my
> culture and family make.  Everyone I knew assumed that once
> Puneet had found a job, there was really nothing more I was
> required to achieve for myself professionally or financially.
>
> As soon as we had settled in New York, Puneet was the only
> person in my life who turned this thought process on its head for
> me.  He pushed me hard to dream bigger, to create choices for
> myself and achieve my full potential.  He urged me to prepare for
> my GMAT, researched MBA programs, and made me believe that
> I could do so much more professionally.  I have only Puneet to
> thank for the professional path and financial independence I can
> claim as mine today.

Exhibit B, B. Mehra Ltr. at 2.  Mr. Dikshit's contributions to their marriage go far beyond

helping Bhanu succeed professionally.  Manjari, a friend of the couple, attests to Mr. Dikshit's

devotion to Bhanu:

> The love and care Puneet bestows on his friends is amplified
> several times more for his family.  Anyone who has spent a few
> minutes in their company, can attest to how much Puneet dotes on
> and cares for his wife.  From the smallest decisions like picking a
> restaurant for dinner to deciding where to live, and performing
> most of the household chores, Puneet has always prioritized his
> wife's needs, wishes and happiness over his own.

Exhibit D, M. Sharda Ltr. at 1.

In addition to being a devoted husband, Mr. Dikshit is an exceptional father to his four-

year-old daughter and 20-month-old son.  As Bhanu explains:

> With the birth of our daughter in May 2017, I witnessed Puneet
> evolve into a man with increased patience and compassion, and
> truly watched his heart grow with his children.  I have always
> known him to be a man of remarkable focus with a job at hand and
> saw this translate even into play times with the children.

Exhibit B, B. Mehra Ltr. at 3.  A friend, Dishank, recounts visiting Mr. Dikshit in New York,

commenting that "it was fascinating to see Puneet mature into such a caring, loving, and doting

father and husband."  Exhibit C, D. Kamath Ltr. at 2.

Mr. Dikshit's friends uniformly agree that he is a doting and loving father.  On friend,

Rahul, writes, "I've seen Puneet actively, and happily, participate in every aspect of raising a

child.  No surprise that both children are extremely attached to him."  Exhibit  E, R. Nath. Ltr. at

2. Another friend, Pinak, also notes the many ways Mr. Dikshit is involved as a father.

"Culturally, Indian men are not as involved with parenting as much as their wives.  But Puneet is

involved in everything from feeding the babies, cooking food for them, changing nappies,

putting them to bed, and calming them down during meltdowns."  Exhibit F, P. Deshpande. Ltr.

at 3.  Manjari concurs:

> Puneet is also such a loving dad to his two beautiful kids, one can easily see that he derives tremendous pleasure from watching his children grow, learn and try new things.  He has often turned down Saturday brunches with friends as he prioritized taking his daughter to the park or on playdates.  He has meticulously planned their birthday parties and ensured that they always had the biggest smile on their faces. The love the children feel for their father can be witnessed by the excitement and joy with which they run to hug him whenever he comes back from work or how they constantly cling to him when he's around.

Exhibit D, M. Sharda Ltr. at 1.

Mr. Dikshit's involvement as a father goes beyond ordinary care.  As Pinak explains, "Puneet's involvement as a parent, not just in taking care of his children, but also in stimulating their imaginations while playing with them, shows how profoundly he loves his kids."  Exhibit F, P. Deshpande. Ltr. at 3.  Bhanu describes the ways her husband engages their daughter's creativity and imagination while they play together:

> Puneet spends hours ahead of playtime, putting together clues—creative rhymes and small puzzles—on little post-it notes around the house for a "treasure hunt" for our daughter. This was their favorite activity during Covid, and I found it amazing, all the time and effort he took to keep our daughter engaged and learning as he taught her the value of "earning" her treasure and not just handing it to her.

Exhibit B, B. Mehra Ltr. at 3.  Mr. Dikshit's father describes his son as a "responsible and nurturing father."  Exhibit A, V. Dikshit Ltr. at 3.  He writes:

> Even when [Puneet] has had a long busy day, he spends multiple hours with his kids each evening, playing with them, creating treasure hunts, painting, reading to them, and putting them to bed. He has been a great father not just by spending quality time with his kids, but also ensuring that he teaches them values that are important to him - gratitude, empathy, kindness, honesty.

Exhibit A, V. Dikshit Ltr. at 3.

Mr. Dikshit also maintains a deep connection with immediate and extended family as well as long-distance friends.  Mr. Dikshit's sister, Nidhi, writes, "Puneet has been the rock-solid

9

pillar in making sure all the family members are together through thick and thin of every

situation and has been there to help every inch of the way – emotionally, financially and

physically."  Exhibit G, N. Dikshit Ltr. at 2.  She explains that "[d]espite being younger, he

always took care of me as an elder brother would," (N. Dikshit Ltr. at 1), and recounts the help

Mr. Dikshit provided when she had just moved to the United States and was struggling to get on

her feet:

> Once in the United States, I had a tough time initially getting
> acclimated to the environment both personally and professionally.
> Additionally, I always had doubts about my career choices, and I
> had to start understanding the work culture here.  Puneet clearly
> outlined and helped me prepared for all the opportunities that came
> my way and made sure that I was successful.

Exhibit G, N. Dikshit Ltr. at 1-2.  When she and her husband were struggling financially, Mr.

Dikshit did not hesitate to help:

> My husband and I faced severe financial hurdles in 2014 and 2015
> due to a number of personal reasons.  Puneet was there to not only
> offer financial assistance but also to help us prepare to become
> financially independent.  He paid our mortgage and other home
> expenses as we started building out own finances together.  This
> continued for more than a year while he had to manage his own
> family.

Exhibit G, N. Dikshit Ltr. at 2.

Mr. Dikshit takes an active role in his nephews' lives too, despite living several hundred

miles away.  Nidhi describes how her brother is a role model for her two sons, who adore and

admire their uncle:

> For [my kids], Uncle Puneet is their world. . . .  Puneet has been
> directly or indirectly connected to every shred of happiness and joy
> for my sons, who are now ages 10 and 7.  Whether it was giving
> them their first bikes, puzzles, toys, sophisticated games, tips to
> excel at studies or general conversations about relevant topics. . . .
> Puneet has been a role model in my kids' lives.  I realized the
> impact he has on them when my 10-year-old son chose to wear a
> University of Michigan jersey during College week at his school.

Exhibit G, N. Dikshit Ltr. at 2.

Mr. Dikshit maintains a close relationship with his parents as well.  In times of need, he provides unwavering support.  As Mr. Dikshit's father, Vijay explains:  "I am a cancer survivor, and my wife has had multiple health issues and Puneet has always been there for us during these hard times."  Exhibit A, V. Dikshit. Ltr. at 2-3.  Bhanu recalls:

> Never one to ignore his responsibilities towards his family, Puneet
> has always been there for his family despite the 16-hour distance
> by air.  I distinctly remember in 2019, when his mother was
> undergoing an emergency hysterectomy back home in Mumbai,
> India, Puneet was by her bedside within a day.  Despite the
> distance and 12-hour time difference, he cared for her during the
> day and worked from the hospital at night.  All this while, he
> would check in on me and our toddler, who were in New York.

Exhibit B, B. Mehra Ltr. at 2.  Puneet's father describes the deep connection they share despite living on different continents:

> Puneet has always been a very caring son and we are very close
> knit as a family.  Despite the over 10-hour time difference we talk
> on the phone multiple times a week and Puneet has made sure that
> our grandchildren also feel connected to us through video calls 2-3
> times a week.  We visit the U.S. every year and stay with Puneet
> in his home in New York for two to three months.  This has
> ensured that we stay close and connected as a family and Puneet
> has always taken care of us exceptionally well.

Exhibit A, V. Dikshit Ltr. at 2.

Mr. Dikshit also maintains close relationships with friends who live many miles away, providing them with a home away from home.  Dishank recalls how Mr. Dikshit kept their friend group together after graduating from the Ross School of Business:  "Once we graduated, we all got different jobs in different cities, but were in constant touch as a close group of friends.  More often than not it was Puneet who would bring us together through social media group discussions – folks' birthdays, anniversaries, life milestones, etc."  Exhibit C, D. Kamath Ltr. at 2.  One friend, Pratishtha writes:

> Pinak and I don't have family in the United States, so Puneet always made sure to plan meet-ups and annual holiday visits, even though we live in different cities and states.  Since 2014, we have celebrated almost all Thanksgiving holidays together, even after having kids.  Earlier it was just an American holiday with a long weekend for me, but over the years it became meaningful.  I look forward to Thanksgiving each year to be with my American family.

Exhibit H, P. Mishra Ltr. at 2.

### C.    Kind Acts and Good Deeds Punctuate Mr. Dilshit's Life

The letters submitted on Mr. Dikshit's behalf reveal a man who is kind, generous, and caring.  Each writer attests to some way Mr. Dikshit has offered support or counsel when most needed, showing the multitude of ways Mr. Dikshit has uplifted those around him.  The letters describe a life marked by acts of kindness and make clear that Mr. Dikshit's compassion extends to all people he encounters.

Pratishtha explains Mr. Dikshit's caring and generous nature, describing the first time she met him:

> I met Puneet in February 2013 at the Detroit airport on my very first day in the United States.  This was my first trip away from home in India and I was more nervous than excited to enter this new phase of my life. . . .  Puneet greeted us warmly and with a big smile he said, "Welcome to America!"  He had also brought me a warm jacket, gloves, and a hat.  That was Puneet.

Exhibit H, P. Mishra Ltr. at 1.  Another friend, Varun, describes when he first met Mr. Dikshit as a business student:

> After 11 years of first meeting Puneet, the reason I still vividly remember our encounter on the first day of college is because of his uncommon generosity and kindness.  As an anxious newcomer who had just moved continents, I had no friends when I started the MBA program at the University of Michigan.  As I sat down for a lonely lunch, I heard Puneet call out my name asking if he could join.  And it wasn't just him, but also some of his other friends who he wanted to introduce me to.  He did this with no reciprocal expectation - I was, after all, a total stranger, and he already had

12

company for lunch.  But Puneet's act of empathy changed the way
I would experience Michigan—with optimism instead of anxiety,
in the company of friends rather than alone.

Exhibit I, V. Garde Ltr. at 1.  Siddhi, a friend who met Mr. Dikshit when he lived in New York,

recalls:

I met him through a friend of mine who was visiting New York for
a few days at the time.  Since I was new in the city and didn't
know a lot of people, my friend encouraged Puneet and his wife to
invite me and my husband over for a holiday party.  I didn't think
much of it at the time but was highly appreciative of him when he
not only invited us over, but also graciously opened up his home
and his circle of friends to us.  I remember him saying, "my friends
are your friends."  I admired the genuine warmth and
thoughtfulness of that gesture.  It's not often you see such kindness
from a stranger and that immediately struck a chord with me.  In
that moment he was polite, kind and gracious and in the few years
that I've known him since, none of that has changed.

Exhibit J, S. Chugh Ltr. at 1.

As a student, Mr. Dikshit was well known for his academic accolades, but always carved

out time to help others.  During his MBA program, he quickly gained a reputation as someone

who knew how to succeed in the business world.  Even in a hyper-competitive environment, Mr.

Dikshit was always willing to lend a helping hand to friends and strangers alike.  Pinak, Mr.

Dikshit's business school friend, explains how Mr. Dikshit went to great lengths to help him find

a job:

Puneet went out of his way to help me in every way he could.  Our
business school would host an annual marketing and tech fair
called the Marketing Symposium where companies would come in
and host a job fair.  Though he had no interest in marketing, he
registered for the symposium and attended the job fair just to help
me get a job.  He walked around and joined in conversations with
prospective employers, calling me over to introduce me to them.
He spent almost two hours talking to companies he had no
intention of working for, either extracting snippets about them
which he would later tell me so that I could strike up a
conversation or introducing me as a "tech-star" to new contacts to
bolster my professional reputation.  Puneet's help resulted in three

13

> interview calls for me, after which I landed an internship offer.  He
> had nothing to gain from this endeavor, except the need to help a
> friend.

Exhibit F, P. Deshpande. Ltr. at 1.

At school, mentoring became a role Mr. Dikshit embraced:

> Having secured offers from all the top-tier consulting firms quite
> early on in the process, Puneet dedicated the rest of his time at
> Ross in helping others secure their job offers.  He spent countless
> hours conducting mock-interviews, hosting seminars and group
> sessions, and helping everyone who would come to him for
> assistance with improving their interviewing and case-solving
> capabilities.  I personally know eight people who Puneet has
> directly helped in converting their first- or second-round interviews
> into concrete internship and job offers.  Puneet was so well known
> that when the class of 2014 came in, new students would randomly
> walk up to him and ask for advice – and not a single one of them
> was denied his time.  We would be sitting together having coffee
> or a general chat, and a group of 5-6 people would run to him for
> advice.  It became a running joke among our friend group where
> we started affectionately calling him "Baba" – a colloquial Indian
> term for a "Guru."

Exhibit F, P. Deshpande. Ltr. at 2.

This theme resonates throughout every letter sent on Mr. Dikshit's behalf.  His friend,

Dishank, describes Mr. Dikshit's personal involvement in uplifting other students at the Ross

School of Business:

> In the second year of business school, I was surprised that Puneet
> still had a very busy schedule.  Most of us had job offers and were
> exploring different classes or involved in social and school club
> activities.  However, Puneet was focused on giving back to the
> school community.  He spent most of his time helping first year
> students with their consulting job interviews preparation.  His
> calendar was always booked from 7am-9pm, helping as many
> students as he could.

Exhibit C, D. Kamath Ltr. at 1.  Another friend, Eduard, also describes the ways
Mr. Dikshit helped him succeed in his job search during their time at Ross
together:

> Despite competing for the same positions, Puneet was a
> tremendous help in this process, offering advice on how to
> improve my interview approach, and taking time to coach me via
> mock interviews.  I saw him do the same with several of our
> classmates.  This extended out to other projects and assignments,
> where I knew I could turn to Puneet for support, and he would
> never hesitate to offer guidance or a unique perspective.

Exhibit K, E. Mikinberg Ltr. at 1.

Mr. Dikshit continued to help others in the professional world, offering his counsel and

support.  Another friend, Manjari, describes how Mr. Dikshit's helped her navigate her

professional life:

> Being a woman in the male-dominated technology industry, I
> frequently sought Puneet's advice on how to navigate professional
> challenges.  I have never regretted following his advice as it has
> always worked for me.  He's taught me how to think strategically
> and navigate corporate bureaucracy.  Whenever I had a job
> interview, Puneet would help me prepare with mock interviews.
> He was always very patient and eager to help despite his hectic
> work schedules.

Exhibit D, M. Sharda Ltr. at 1.

Mr. Dikshit's acts of kindness extend far beyond helping his peers succeed

professionally.  He has consistently offered a helping hand when he has learned others—even

strangers—are in need.  His father explains:

> Once Puneet started his professional life, we saw his generosity
> blossom further.  He has helped so many people and made such a
> tremendous impact in their lives.  One early example is from 2005,
> when Puneet had just started working. He heard about how the
> mother of one of my junior associates was seriously ill and
> couldn't afford any treatment.  Puneet immediately offered to pay,
> and she survived and went on to live for many more years.  This
> was almost equivalent to one month of Puneet's salary at that time
> and my associate just could not express his gratitude.

Exhibit A, V. Dikshit Ltr. at 2.  Vijay recalls a number of other instances where Mr. Dikshit

offered support to others:

> When Puneet found out that our house help's wife had breast cancer, he proactively paid for her very expensive surgery and even their household expenses. When he learned about how the young children of our gardener were not receiving high-quality educations, he immediately provided financial assistance. When our apartment complex's security guard's home was devastated during floods, Puneet again provided financial support immediately and proactively.

Exhibit A, V. Dikshit Ltr. at 2.

The letters of support show that kindness is just in Mr. Dikshit's nature and provide numerous examples of times he has gone out of his way to help others. For example, Pinak recounts:

> Once when my mother-in-law was flying to the United States for the first time, there was a chance her layover flight could be cancelled, requiring her to wait in a foreign airport alone for over 12 hours. My wife and I happened to mention this to Puneet, who insisted on picking up my mother-in-law at Newark Airport, driving her to his home in Manhattan so she could rest, and driving her back to the airport. Puneet ensured that my wife and I were at peace knowing my mother-in-law would be safe and in good company.

Exhibit F, P. Deshpande Ltr. at 2.

### D.    Mr. Dikshit Has Remained Committed to Charitable Work and Community Service Throughout his Life

Mr. Dikshit has maintained a deep commitment to charitable work and community service throughout his life. Indeed, Mr. Diksit has always gone out of his way to help others, even as he focused on attaining academic and professional success. He has poured time, energy, and heart into uplifting others and bettering his community throughout his entire life.

Mr. Dikshit's community service started at an early age, when he began volunteering to help the homeless people who gathered near his temple. At just 12 years old, Mr. Dikshit began a weekly ritual of donating food to the temple with his father, sometimes donating an entire day's worth of food. Once a quarter, he would serve food to the homeless members of his

community, speaking with them to understand what brought them to that place in life.  As explained by Mr. Dikshit's father, Vijay:

> Puneet's acute awareness of the needs of those less privileged than him and his desire to help them in every way he can has been an integral part of who Puneet is.  Growing up, Puneet and I used to go to the temple each week to donate to and feed the homeless. . . . [M]y wife and I made it a point to teach both our kids about gratitude, privilege, equality, and the obligation to help those in need.  These values were not just taught, but practiced by us and our kids, and the weekend work with the homeless was just a small part of imbibing these.

Exhibit A, V. Dikshit Ltr. at 1.  As Mr. Dikshit formed relationships with the homeless in his community, he learned not to judge others for their circumstances.  Mr. Dikshit continued his volunteer work at the temple for eight years.  He continued to serve food to homeless members of his community through high school and college, only stopping after his family moved away from the temple when he was 20 years old.

Mr. Dikshit continued to help underprivileged members of his community as a business student at NMIMS, forming the Social Responsibility Forum ("SRF") in his first year of school. The SRF was an organization dedicated primarily to raising funds for the Akanksha Foundation, a charitable organization in India that helps underprivileged girls obtain education in India. Bhanu explains that, "[o]ne of the causes most dear to [Puneet] has been to enable education for underprivileged girls in India.  Culturally, many poor families do not send their girls to school in India."  Exhibit B, B. Mehra Ltr. at 1.  Recognizing the importance of high-quality education in his own life, Mr. Dikshit made it a priority to help the least fortunate members of the community obtain access to the same opportunities.  Vijay recalls his son's work with the SRF, explaining that "[a]side from winning several accolades, [Puneet] started one of the leading student-led non-profits called the Social Responsibility Forum.  SRF focused on enabling education for underprivileged girls that functions to this day."  Exhibit A, V. Dikshit Ltr. at 1.

17

As co-founder and president of SRF, Mr. Dikshit devoted substantial time to planning events to raise money for underprivileged members of his community in India.  Mr. Dikshit's fundraising efforts were devoted not only to helping young Indian girls obtaining educations, but also to helping others in his broader community.  Ravi, Mr. Dikshit's brother-and-law and friend, explains:

> While SRF had initially focused on a wider array of issues facing the community (e.g., homelessness, health benefits for the underprivileged), by the second year of his Master's program, Puneet had narrowed SRF's focus on the education of underprivileged girls.  Educating young girls is still a rarity in many poorer communities in India, not just due to financial limitations but also cultural issues.

Exhibit L, R. Mehra Ltr. at 1.  At school, Mr. Dikshit "leverage[d] his relationship with the Social Responsibility Forum, a student non-profit he founded in graduate school, to organize events like clothes and toy donation drives, blood donation drives, mentor-a-child initiatives, and annual festivals."  Exhibit B, B. Mehra Ltr. at 2.   The time and effort Mr. Dikshit invested in SRF paid dividends.  In his two years at NMIMS, "[h]e raised significant amounts of money for this cause, enlisting leading Indian companies as sponsors by leveraging his professional and personal relationships, collectively raising approximately $150,000 over a three-year period, which is a significant amount in India."  Exhibit B, B. Mehra Ltr. at 2.  "The work [Puneet] did with SRF, especially the focus on education of underprivileged girls, has had a lifelong impact on over 1,500 children."  Exhibit A, V. Dikshit Ltr. at 1.

Mr. Dikshit was essential to SRF's exponential growth and continuing success.  When founding the SRF, Mr. Dikshit envisioned an organization that would continue to support the least fortunate members of his community long after he graduated.  As its leader, Mr. Dikshit spent many hours recruiting new members to grow the club into a sustainable pillar NMIMS.  Mr. Dikshit's efforts growing SRF resulted in resounding success.  Ravi explains that, "Puneet

was clearly extremely passionate about this topic and mobilized and inspired over 300 SRF student members to raise funds."  Exhibit L, R. Mehra Ltr. at 1.  In just two years, Mr. Dikshit helped the organization expand from the two founding members to a prominent organization encompassing over half of the student body.  One friend, Saurabh, explains:  "In the two years since founding SRF, it had already become the largest student club on campus with events, fundraising drives, sponsors, and a large pool of students who carried on and handed down Puneet's legacy."  Exhibit M, S. Gupta Ltr. at 1.

Even as he began his career, Mr. Dikshit continued his hands-on role in helping underprivileged girls in his community receive educations.  After graduating, he continued his involvement in SRF to ensure that it would remain an important pillar in his community.  Ravi explains:

> When I joined NMIMS University in 2007, SRF was the largest student-led non-profit in the state, and Puneet was still involved as a mentor to the organization.  On weekends, he would continue to spend time in poor neighborhoods, joining student classes, speaking to parents, and even helping engage with sponsors.  SRF, and Puneet's commitment, has resulted in more than 1,500 girls graduating high school from programs supported by SRF.

Exhibit L, R. Mehra Ltr. at 1.  SRF remains an integral part of NMIMS today.[1]  Mr. Dikshit has continued to support the Akanksha Foundation since graduating in 2005, donating every year.  "Enabling children to receive education has been a consistent value across all these years for Puneet, and he has personally contributed thousands of hours and almost a hundred thousand dollars to this cause in the last 15 years."  Exhibit B, B. Mehra Ltr. at 2.

Additionally, during the four years he worked for Citibank after graduating from NMIMS, Mr. Dikshit volunteered as a teacher for underprivileged girls ages 8 to 12 on

---

[1] *See* Social Responsibility Forum of SBM, NMIMS Mumbai, https://www.srfnmimsmumbai.com/ (last visited March 14, 2022).

weekends.  As Bhanu recounts:  "Puneet used to visit underprivileged areas in Mumbai for weekend classes to teach math and English to young children and girls for several years.  In addition to spending 6-8 hours each week volunteering to teach, Puneet also spent this time on mentoring and being a role model for the children."  Exhibit B, B. Mehra Ltr. at 1-2.  As a volunteer teacher, Mr. Dikshit would help the primary teacher with whatever the lesson plan was for that day, lecturing a class of 35 to 40 girls about a different topic.  He would make it a point to connect with the girls after class, chatting to them about his career and providing them with a role model.  Bhanu describes the effect Mr. Dikshit's volunteer work had in his community:  "The impact that Puneet had in the lives of these kids was truly transformative.  Several hundreds of the children he worked with through SRF and subsequently through volunteer teaching are now in college and pursuing advanced degrees."  Exhibit B, B. Mehra Ltr. at 3.

Today, Mr. Dikshit continues to champion education for the less fortunate back in Mumbai even from across the globe.  He and his father are working together to build a school for underprivileged children in their hometown back in India.  Vijay describes their joint efforts:

> For years, we had been discussing how the primary school in my ancestral hometown was in very bad shape and children studying there were deprived of basic facilities.  Puneet suggested that we form a trust to build a new school with a capacity of 100 students and provided the seed funds to build the trust.  He laid out the annual plan, helped scout for locations, outlined the management model, and corralled other family members and contributors to get engaged.  Puneet has helped raise approximately $20,000 in India and, through his efforts, we are already in the process of starting to build this vision that we have shared for many years.

Exhibit A, V. Dikshit Ltr. at 2.

Mr. Dikshit imparts the same values of selflessness and compassion that he learned as a child onto his own children, renewing the same ritual of feeding the homeless every week that he had with his own father.  Bhanu describes how he has already begun to make charitable work a

staple in his children's lives:  "Puneet has tried to ensure he passes the same values to our

children, reminding them of other children in the world who do not have access to clean water or

a wholesome meal.  On the way to school drop off, once a week, Puneet has our daughter choose

breakfast sandwiches to offer to the homeless outside St. Bartholomew's Church in midtown

New York."  Exhibit B, B. Mehra Ltr. at 3.  This practice helps his daughter understand the

importance of giving back, and ensures that community service becomes a multi-generational

tradition in the Dikshit family.

## IV. THE 18 U.S.C. § 3553(a) FACTORS WEIGH IN FAVOR OF A BELOW-GUIDELINES SENTENCE

### A. Mr. Dikshit's Life and Character Support a Below-Guidelines Sentence

We respectfully submit that Mr. Dikshit's charitable work and good deeds support a

below-Guidelines sentence.  *See United States v. Mehta*, 307 F. Supp. 2d 270, 270, 284 (D.

Mass. 2004) (issuing a probationary sentence to a white-collar defendant who facilitated the

practice of his ancient religion in his area and provided personal support to many members of his

community).  Mr. Dikshit's charitable acts have involved "hands-on" work and "sacrifice[s] of a

personal nature" that are distinguishable from the impersonal work performed by other white-

collar defendants.  *United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005) (affirming a non-

incarceratory sentence for a defendant who mentored young boys and created a youth athletic

organization in his community).

Cases like Mr. Dikshit's have resulted in significant below-Guidelines sentences.  In

*United States v. Canova*, the Second Circuit affirmed a trial court's downward departure from a

Guidelines sentence based on the "exceptional degree of Canova's public service and good

works."  412 F.3d 331, 358-59 (2d Cir. 2005), *remanded in part on other grounds*, 2005 WL

6051354 (D. Conn. Nov. 10, 2005).[2]  In that case, the district court determined that the

Guidelines range was 15 to 21 months following a guilty jury verdict for Medicare fraud, but

imposed a sentence of a one-year term of probation.  *Id.* at 342-43.  The Second Circuit

affirmed, finding that the district court did not abuse its discretion in considering Canova's good

deeds. *Id.* at 359.  The Second Circuit acknowledged that defendant's service as a voluntary

firefighter and three instances of administering aid to three people in medical distress

demonstrated that helping people "was an instinctive part of his character."  *Id.*

     Courts outside this Circuit hold similarly.  In *Cooper*, for example, the Third Circuit held

that a defendant's good works warranted a downward departure from the Guidelines because, as

"hands-on personal sacrifices, which . . . had a dramatic and positive impact on the lives of

others," they were "exceptional."  394 F.3d at 177.  There, the defendant was significantly

involved in helping young men in an underprivileged neighborhood in his city.  *Id.*  His work

involved coaching and mentoring high-school football players, founding a youth athletic

organization, and helping athletes apply to and pay for college.  *Id.*  In affirming the district

court's non-incarceratory sentence for securities fraud, the court distinguished the defendant's

acts from financial contributions to charity, finding that:  "These are not the detached acts of

charity one might ordinarily expect from a wealthy business executive.  They are, in a very real

way, hands-on personal sacrifices, which have had a dramatic and positive impact on the lives of

others."  *Id.* at 173-74, 177.  Though the Guidelines recommended a range of 15 to 21 months in

prison, the court found that the trial court properly exercised its discretion in sentencing the

---

[2] The analysis for downward departures is similar to that for non-Guidelines sentences.  Courts may depart downward so that they have the "flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices."  *Departure and Variance Primer*, Office of General Counsel, U.S. Sentencing Commission, Nov. 2021 at 5, https://www.ussc.gov/sites/default/files/pdf/training/primers/2021_Primer_Departure_Variance.pdf (quoting 28 U.S.C. § 991(b)(1)(A)).  Similarly, courts have discretion to vary from the Guidelines after considering all the factors set forth in 18 U.S.C. § 3553(a), including the individual history and characteristics of the defendant.  *Id.* at 42-43; *see also* U.S.S.G. § 1B1.1 cmt. background.

defendant to three years' probation with six months house arrest for securities fraud.  *Id.* at 173-74, 175.

In another instructive case, *United States v. Mehta*, the court sentenced the defendant to three years' probation for tax evasion and mail fraud though the Guidelines recommended a sentence of 18 to 24 months incarceration.  307 F. Supp. 2d at 270, 284.  The court found that the voluminous evidence of the defendant's "extraordinary life" of "charitable and community works" supported a downward departure from the Guidelines.  *Id.* at 270-71.  The court noted that "the *nature* of Mehta's service . . . that took the form of substantial amounts of time and personal attention" that supported a non-incarceratory sentence.  *Id.* at 271.  The defendant's community service included helping those in need in the Boston area and within his religious sect both in America and back in India.  *Id.*  Specifically, the court noted that the defendant "provided personal support to members of his community and beyond, when family members were sick or passed away, helped others to start a business, contributed to medications for others who could not afford them, even helped with college tuition or mortgage payments."  *Id.* at 279-80.  The court found that this work went "far beyond writing checks" and instead involved devoting "a considerable amount of his time" to helping others.  *Id.* at 282.

Mr. Dikshit has engaged in numerous similar charitable acts and good deeds.  He has remained steadfast in his pursuit of helping others and empowering his community, even while attaining professional success and starting a family.  His extensive and prolonged work with underprivileged girls in Mumbai is exceptional.  Indeed, Mr. Dikshit's hands-on volunteer work teaching young girls, raising money for underprivileged students, and creating a school from the ground up have "had a dramatic and positive impact" on the hundreds of people.  *Cooper*, 394 F.3d at 177.  Additionally, Mr. Dikshit's family and friends attest to the numerous ways he has

gone out of his way to help others, from spending many hours preparing friends for job interviews to providing financial assistance to strangers in times of dire need. These acts demonstrate that generosity and compassion are "instinctive" to Mr. Dikshit's character. *Canova*, 412 F.3d at 359. While the Guidelines ranges in *Canova*, *Cooper*, and *Mehta* were lower than Mr. Dikshit's recommended range, we respectfully submit that those cases and Mr. Dikshit's charitable acts and good deeds, individual characteristics, and the immigration consequences he faces (discussed below), support a non-incarceratory sentence.

### B.     Mr. Dikshit Does Not Pose a Risk of Recidivism

Mr. Dikshit does not pose a risk of reoffending. He has never been accused of criminal conduct before, and his early acceptance of responsibility and statements demonstrate his sincere remorse and that he will not reoffend. Indeed, the Probation Office reported that because Mr. Dikshit is "very remorseful for committing the instant offense," he "appears to pose a low risk of recidivism." PSR at 27. The guilt of the offense has been "eating him alive" since before his arrest, causing him to experience many sleepless nights. PSR ¶ 88. At his plea hearing, Mr. Dikshit expressed his remorse for the offense and the effect it has had on his family, colleagues, and industry. Plea Tr. at 18:14-21 (Dec. 15, 2021) [ECF No. 11].

Mr. Dikshit's acceptance of responsibility and remorse led him to enter his guilty plea promptly. Shortly after committing the offense ending in September 2021, Mr. Dikshit began contemplating turning himself in to authorities. He ran searches related to Rajat Gupta, a former McKinsey employee who was convicted of insider trading in 2012, trying to find counsel to consult about this decision. PSR ¶ 56. Mr. Dikshit discovered that Mr. Gupta was represented by Kramer Levin, and he retained undersigned counsel shortly thereafter. While discussing the

profound consequences of his offense with counsel and his family, Mr. Dikshit was arrested.

Mr. Dikshit promptly notified authorities that he intended to enter a guilty plea.  PSR ¶ 73.

In addition, Mr. Dikshit has already consented to a forfeiture and money judgment of $455,017, the total amount of proceeds from the offense.  *See* Consent Preliminary Order of Forfeiture/Money Judgment, entered December 15, 2021 [ECF No. 10].  He similarly consented to a judgment in the parallel civil action brought by the Securities Exchange Commission that includes other punishments for the offense conduct.  *See SEC v. Dikshit*, Judgment, 21-cv-9289-JMF (Jan. 31, 2022) [ECF No. 11].  As part of that judgment, Mr. Dikshit agreed never to engage in fraudulent or deceitful conduct related to the purchase or sale of securities again.  *Id.*

Further, the damage to Mr. Dikshit's career and reputation ensure that he will never reoffend.  Mr. Dikshit's case has been widely published, making it unlikely that he will be able to gain employment in a similar position in the future.  *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 194 (E.D.N.Y. 2016) (below-Guidelines probationary sentence sufficient where defendant would not be able to pursue a teaching career as a result of her conviction).  The loss of career and income Mr. Dikshit has suffered as a result of the offense has also been punishing. *See United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) ("Elimination of the defendant's ability to engage in similar or related activities—or indeed any major business activity—for some time, and the substantial loss of assets and income . . . constitutes a source of both individual and general deterrence."), *aff'd,* 31 F.3d 73 (2d Cir. 1994).

Further, the offense is an aberration in Mr. Dikshit's life, which he has otherwise led with honesty, commitment to community, and dedication to family.  His conduct should therefore be considered in the greater context of his life.  Mr. Dikshit's father, Vijay, best explains:

> I have seen the values that helped our family - hard work,
> kindness, generosity, honesty, and empathy – become deeply

> ingrained in Puneet.  Hence, the circumstances under which I write
> this letter to you are not just out of character for Puneet, but alien
> to how he has lived his life and conducted himself since he was a
> child.

Exhibit A, V. Dikshit Ltr. at 1.

The aberrational offense conduct, when balanced against the rest of Mr. Dikshit's life and

character, supports a below-Guidelines sentence.  The decision in *United States v. Holzer* is

instructive.  There, the court issued a below-Guidelines sentence for a defendant who pled guilty

to insider trading.  Sentencing Tr. at 18-19, *United States v. Holtzer*, 09-cr-470 (VM) (S.D.N.Y.

Sept. 17, 2009).  Though the Guidelines range for the defendant was 12 to 18 months

imprisonment, the court found that a sentence of five years of probation, conditioned on

spending nine months in a residential reentry center was "sufficient but not greater than

necessary to comply with the purposes of sentencing" based, in part, on the fact the offense was

an aberration of an otherwise good life.  *Id*.  Specifically, the court noted that the defendant had a

"commendable" history of community service and pro bono work, "ha[d] no criminal history,

and that . . . his life outside of this case demonstrates that he is a good person who made a

terrible mistake." *Id.* at 16-17 (internal quotations omitted).

Similarly, a defendant's aberrant conduct also formed the basis for a below-Guidelines

sentence in *United States v. Toback*, 01-CR-410 (RWS), 2005 WL 992004 (S.D.N.Y. Apr. 14,

2005).  There, the court found that the defendant's conduct in selling illegal drugs "seem[ed] to

be an aberration in his normally law-abiding life." *Id*. at *5.  The court noted that the defendant

quickly entered a guilty plea and immediately accepted responsibility for his conduct, and issued

a sentence of three years supervised release with ten months of home confinement, though the

Guidelines range was 10 to 16 months imprisonment.  *Id*. at *3-4, 6.  The court found that

downward departure was warranted because the defendant's letters of support demonstrated "his

outstanding and reliable character, his devotion to his family, and his dedication to his business"
and that "the criminal conduct at hand spanned a short period of time, [and] involved minimal
planning." *Id.* at *5.

Like the defendants in *Holzer* and *Toback*, Mr. Dikshit is a first-time offender who pled
guilty to aberrational conduct. In light of the broader context of Mr. Dikshit's life—marked by
kind acts, good deeds, and community service—coupled with the immigration consequences he
faces, we respectfully submit that a non-incarceratory sentence, coupled with disgorgement and
deportation, will satisfy the twin goals of punishment and deterrence set forth in 18 U.S.C. §
3553(a).

### C.   Enhancements Related to Gain Amount Overstate the Seriousness of the Offense

Though insider trading is a serious offense and creates unfairness in investment markets,
"Congress has never treated it as a fraud on investors, the Securities Exchange Commission has
explicitly opposed any such legislation, and the Supreme Court has rejected any attempt to
extend coverage of the securities fraud laws on such a theory." *United States v. Gupta*, 904 F.
Supp. 2d 349, 351-52 (S.D.N.Y. 2012). In insider trading cases, "the victims and their losses are
difficult if not impossible to identify," so the offense level is enhanced based on the gain
resulting from the offense rather than a loss amount. U.S.S.G. § 2B1.4, cmt. background. As
Judge Rakoff has explained:

> In the eye of the law, Gupta's crime was to breach his fiduciary
> duty of confidentiality to Goldman Sachs; or to put it another way,
> Goldman Sachs, not the marketplace, was the victim of Gupta's
> crimes as charged. Yet the Guidelines assess his punishment
> almost exclusively on the basis of how much money his
> accomplice gained by trading on the information. At best, this is a
> very rough surrogate for the harm to Goldman Sachs.

*Gupta*, 904 F. Supp. 2d at 352.  Section 2B1.1 enhancements "do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."  *United States v. Johnson*, No. 16-CR-475-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018).  Thus, "district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that the guideline provides" when cases involve § 2B1.1 enhancements.  *Id.* (quoting *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J, concurring)).  This is particularly so because there is no traditional victim in an insider trading case.  *See Gupta*, 904 F. Supp. 2d at 352.  In this regard, we note that GreenSky, McKinsey, and Goldman Sachs are not seeking restitution.  *See* PSR ¶¶ 60, 126.

### D. The Collateral Consequences Mr. Dikshit Faces As a Non-Citizen Weigh in Favor of a Non-Incarceratory Sentence

Courts must also consider the collateral effects of a sentence to "properly calibrate a 'just punishment."  *United States v. Nesbeth*, 188 F. Supp. 3d 179, 193 (E.D.N.Y. 2016) (quoting *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009)).  When determining what sentence is appropriate for a defendant, "a sentencing judge cannot ignore the additional penalties and hardships that will attach as a result of conviction."  *United States v. Chong*, No. 13-CR-570, 2014 WL 4773978, at *6 (E.D.N.Y. Sept. 24, 2014).

Mr. Dikshit will be treated differently from many other white-collar defendants because he is not a United States citizen.  Despite living in the United States lawfully for over a decade, Mr. Dikshit is classified as an "alien."  That designation carries significant consequences.

As a non-citizen, any sentence of incarceration would result in Mr. Dikshit spending more days spent in jail than a similarly situated citizen, because non-citizens are ineligible to serve any portion of their terms in a halfway house.  Mr. Dikshit also faces an additional period

28

of detention with ICE prior to his removal.  Further, Mr. Dikshit and his family will be uprooted from the community they have lived in for over a decade and deported to India as a result of the offense.  Because Bhanu's H1B visa is tied to Mr. Dikshit's, his loss of employment will require her to leave the United States upon its expiration, barring a change in her immigration status.  As a result, any sentence of incarceration would be atypical for Mr. Dikshit because his family would have limited ability to visit him.  Mr. Dikshit's conviction will also result in his removal from the country following any jail term.  A typical white-collar defendant who has committed the same offense would not face these consequences.

We respectfully submit that the disparate conditions Mr. Dikshit would face if imprisoned and the deportation consequences of his conviction warrant a non-incarceratory sentence.

      1.    <u>Disparate Treatment</u>

As a non-citizen, Mr. Dikshit is classified as a "deportable alien" by the Federal Bureau of Prisons ("BOP").  U.S. Dep't of Justice, Fed. Bureau of Prisons Program Statement, *Inmate Security Designation and Custody Classification*, P5100.08 (Sept. 12, 2006) at ch. 5, pp. 9, 12.[3] First-time, non-violent offenders are ordinarily considered a minimum-security inmate eligible for placement in a federal prison camp.  *Id.* at ch. 1, p.2; ch. 5, p12.  However, prisoners with a "deportable alien" designation must instead be detained in *at least* a low-security facility.  *Id.* at ch. 5, pp. 9, 12 (emphasis added).  While minimum-security facilities exclusively house non-violent offenders with sentences under 10 years, low-security facilities house prisoners who have committed violent offenses garnering prison terms of up to 20 years and who have exhibited violent or threatening behavior.  *Id.*

---

[3] PDF available at https://www.bop.gov/policy/progstat/5100_008.pdf.

Because of his non-citizen status, Mr. Dikshit is not eligible to spend any portion of his incarceration in a halfway house.  Federal law requires that the BOP, "to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community."  18 U.S.C. § 3624(c)(1).  This policy, however, does not apply to "deportable aliens," who will not be returning to their communities at the end of their terms.  U.S. Dep't of Justice, Fed. Bureau of Prisons Program Statement, *Change Notice*, 7310.04 (Dec. 16, 1998) at 10.[4]  As a result, Mr. Dikshit will serve more days of any term of incarceration inside a prison than similarly situated citizen defendants.

Through Mr. Dikshit has lawfully lived in the United States for over a decade, it is likely he will be detained by ICE following any sentence of incarceration or house arrest, and would be immediately taken into custody if this Court imposes a probationary sentence or supervised release.  *See* 8 U.S.C. § 1226(a)(1).  Any alien convicted of insider trading like Mr. Dikshit is subject to mandatory detainment.  *See* 8 U.S.C. § 1226(c)(1)(B)-(C) (stating that the Attorney General will detain aliens who have committed offenses covered in Section 1227(a)(2)(A) (i)-(iii)); 8 U.S.C. § 1227(a)(2)(A)(i), (iii).  Because Mr. Dikshit has pled guilty to insider trading, he faces additional detainment in ICE custody following his sentence while removal proceedings are commenced against him.  As an ICE detainee, Mr. Dikshit would face deplorable conditions. In an investigation of four ICE detention facilities, the OIG found "egregious violations of detention standards" posing "significant health and safety risks."  *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities*, U.S. Dep't of Homeland Security, Office of

---

[4] PDF available at https://www.bop.gov/policy/progstat/7310_004.pdf.

the Inspector General, Aug. 2016 at 3.[5]  This disparate treatment Mr. Dikshit faces as a non-citizen constitutes additional punishment warranting a non-incarceratory sentence.

      2.   <u>Deportation</u>

      Deportation of Mr. Dikshit and his family is a collateral consequence that further weighs in favor of a non-incarceratory sentence.  Mr. Dikshit has legally resided in the United States for over a decade, growing both his family and career here.  Because Mr. Dikshit entered the United States on an H1B visa, he is subject to removal after sentencing, which will require him to return to India.  *See* PSR at 27.  And further, because his wife's residency is contingent on his visa, Mr. Dikshit's family, including his two children who are United States citizens, will be required to leave the country as well unless her immigration status changes.  After Mr. Dikshit's sentence, Bhanu, and their children will return to India, where they will reside with Bhanu's parents.  PSR ¶ 88.  Accordingly, Mr. Dikshit would likely not be able to see his family during a term of incarceration.  Following his deportation, he will not be able to freely visit his extended family in the United States or many of his friends who submitted letters on his behalf.  *See* 8 U.S.C. § 1326(a)(2) (subjecting deported aliens to criminal penalties if they reenter the United States without applying for readmission).

      "Deportation is experienced as, and popularly understood to be, a form of punishment." *United States v. Chong*, No. 13-CR-570, 2014 WL 4773978, at *6 (E.D.N.Y. Sept. 14, 2014) (imposing a below-Guidelines sentence of time served for a drug offense, in part, because of deportation); *see also United States v. Yahaya*, No. 18-CR-121, 2019 WL 6839945, at *4 (E.D.N.Y. Dec. 9, 2019) (term of time served (three days) and three years' supervised release was "appropriate" for a white-collar defendant despite Guidelines range of 51 to 63 months because he would be deported and "his goal of bringing up his only child in the United States to

---

[5] PDF available at https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf.

seize on  the promise of the American Dream [was] forever extinguished").  In *Padilla v. Kentucky*, the Supreme Court explained:

> Our law has enmeshed criminal convictions and the penalty of
> deportation for nearly a century . . .  And, importantly, recent
> changes in our immigration law have made removal nearly an
> automatic result for a broad class of noncitizen offenders.  Thus,
> we find it most difficult to divorce the penalty from the conviction
> in the deportation context.

559 U.S. 356, 365-66 (2010) (affirming that a failure to advise on the immigration consequences

of sentencing constituted ineffective assistance of counsel under the Sixth Amendment).

Deportation is an especially severe consequence and is "an integral part—indeed, sometimes the

most important part—of the penalty that may be imposed on noncitizen defendants who plead

guilty to specified crimes."  *Id.* at 364.  Therefore, when "determining what sentence is

'sufficient, but not greater than necessary,' to serve the needs of justice, a district court may take

into account the uncertainties presented by the prospect of removal proceedings and the impact

deportation will have on the defendant and his family."  *United States v. Thavaraja*, 740 F.3d

253, 262-63 (2d Cir. 2014).  This "exile" that cuts off a defendant from his "established

community ties" is a "hardship [that] results in a more severe penalty" and lessens the need for

both general and specific deterrence.  *Chong*, 2014 WL 4773978, at *8.  As such, it warrants a

downward adjustment.  *Id.*

In *United States v. Connolly*, this Court issues a below-Guidelines sentence to a

defendant who was convicted at trial of conspiracy to commit wire fraud to manipulate the

LIBOR, in part, because of the disparate treatment he would receive as a non-citizen.  *See*

Sentencing Tr. at 9, 90-94, No. 16-CR-370 (S.D.N.Y. Nov. 4, 2019).  Recognizing that non-

citizen defendants are subject to both immigrant detention and deportation unlike their citizen

counterparts, Your Honor stated:

> [F]or reasons I cannot comprehend, at the end of that term he could
> not walk out the door and be picked up by [his attorney] and taken
> to the airport.  He would be treated like an illegal alien, and he
> would be released into the custody of ICE, and at some point long
> after my intended sentence had expired he would be deported.
> And that's not right . . .  I can't bring myself to impose a sentence
> of incarceration in the United States.

*Id.* at 91-92.   Though the Guidelines, including an intended loss amount of $2,613,214,

recommended a sentence of 57 to 71 months, Your Honor sentenced the defendant to nine

months of home confinement in his home country.  *Id.* at 95.  We respectfully submit that Mr.

Dikshit's circumstances are even more compelling than those in *Connolly*.  Mr. Dikshit pled

guilty, did not engage in a sophisticated conspiracy to manipulate the market, and has a long

history of community service; mitigating factors that were absent in *Connolly*.  Accordingly, the

immigration consequences of Mr. Dikshit's conviction (along with other mitigating factors)

warrants a non-incarceratory sentence.[6]

---

[6] To the extent the Court believes a term of confinement is necessary, the Court could similarly permit Mr. Dikshit
to serve a term of home confinement in India, were his wife and children will be.

## V.    CONCLUSION

We respectfully urge the Court to sentence Mr. Dikshit to a non-incarceratory sentence.

Such a sentence, considering Mr. Dikshit's history, character, and good deeds, coupled with his

removal from the country following any sentence is "sufficient, but not greater than necessary"

to satisfy the sentencing coals set forth in 18 U.S.C. § 3553(a).

Dated:        New York, New York
              March 16, 2022

                        **KRAMER LEVIN NAFTALIS & FRANKEL LLP**

                        /s/ Steven S. Sparling
                        Steven S. Sparling.
                        Michael Martinez
                        Kramer Levin Naftalis & Frankel LLP
                        1177 Avenue of the Americas
                        New York, New York 10036
                        Telephone: (212) 715-9100
                        Facsimile:  (212) 715-8000
                        Email: ssparling@kramerlevin.com
                               mmartinez@kramerlevin.com